# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

Civil Action No.: 2:19-cv-00276-DCN

| | | |
|---|---|---|
| **VIRGINIA PIRATE CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| **TRIDENT TECHNICAL COLLEGE** | ) | **(Jury Trial Demanded)** |
| **ENTERPRISE CAMPUS AUTHORITY;** | ) | |
| **MARY THORNLEY, in her official capacity** | ) | |
| **as President, Trident Technical College** | ) | |
| | ) | |
| **Defendants.** | ) | |

The Plaintiff Virginia Pirate Corporation by and through its undersigned counsel, would respectfully allege and show:

## PARTIES

1. Virginia Pirate Corporation ("VPC") is an Arkansas corporation. VPC is authorized to do business in the State of South Carolina. At all times relevant to this action, VPC operated in interstate commerce by selling college textbooks and course-related materials.

2. Upon information and belief, Trident Technical College Enterprise Campus Authority d/b/a Trident Technical College ("TTC") is organized and existing under S.C. Cod. Ann. § 59-53-470.

3. Mary Thornley is the President of TTC. In her role as President, Dr. Thornley exercises managerial and administrative authority for the ongoing operations of TTC. Dr. Thornley is sued in her official capacity as the President of TTC only.

1

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, because the amount in controversy, exclusive of interest and costs, exceeds $75,000.00, and the parties are citizens of different States.

5. Venue is proper in this judicial district and division pursuant to 28 U.S.C. §1391(b) and Local Civ. Rule 3.01 (D.S.C.) as a substantial part of the events giving rise to the claims occurred in this judicial district and division.

## FACTUAL ALLEGATIONS

6. VPC sells and rents traditional printed textbooks and other course materials ("Printed Materials"), as well as digital textbooks and course related materials ("eText Materials"), to college and university students in South Carolina. In many cases, including at TTC, VPC's Printed Materials and eText Materials are available at local bookstores owned and operated by VPC. VPC's success and profitability depend on its ability to compete fairly for student purchases of Printed Materials and eText Materials, which also helps ensure the students receive the lowest, most competitive prices in the marketplace.

7. eText Materials are digital versions of textbooks and other course materials used as an alternative to traditional, hard copy materials. Typically, students obtain eText Materials by purchasing access codes that are used to access course materials online.

8. In August 2018, TTC announced its scam "Inclusive Access Program" pursuant to which TTC contracted with publishers to offer students eText Materials at set prices. Under the Inclusive Access Program, any TTC student enrolled in a participating class is required, through a so-called "course fee" automatically added to the student's tuition bill, to purchase required eText Materials from only TTC.

9.      The Department of Education requires institutions providing a digital access program to give students an option to opt-out of the program to allow students to purchase books and supplies from other retailers. 34 C.F.R. § 668.164(c)(2)(i)(C) and § 668.164(m)(3). The opt-out provisions are necessary to "enable students to seek potentially lower cost alternatives" such as "used books, rentals or e-books." Program Integrity and Improvement, 80 FR 67126-01. Even with an opt-out option, the Department of Education is still "concerned that students who would otherwise seek lower cost alternatives will settle, out of sheer convenience, for the price of the books and supplies negotiated by the institution." *Id*. Thus, as the Department of Education recognizes, marketplace competition for textbooks and course supplies is necessary to provide students with lower cost alternatives.

10.     The Department of Education also requires institutions providing a digital access program to "[have] an arrangement with a book publisher or other entity that enables it to make those books or supplies available to students below competitive market rates." 34 C.F.R. § 668.164(c)(2)(i)(B). TTC understood this requirement, and it falsely advertised to its students that TTC's prices were the lowest. *See* **Exhibit A**.

**Inclusive Access**

Your instructor wants the best opportunities available to you when purchasing course materials, so we're using the Inclusive Access billing model. This means you will have immediate access to your MyLab, Revel or ebook course materials at the lowest possible price!

11.     When a student is enrolled in a course participating in the Inclusive Access Program, TTC falsely represents to its students that that cost to purchase eText Materials from TTC is $0.00. TTC's representations mislead students to believe that eText Materials made available through TTC's Inclusive Access Program are free. TTC's misrepresentations intentionally dissuade students from purchasing eText Materials from other vendors, including

3

VPC. Below and attached hereto as **Exhibit B** is a screenshot from the TTC bookstore website falsely representing that required eText Materials for a history course will cost $0.00 through TTC's selected publisher Pearson.



12. TTC represents on its website that TTC students are able to opt-out of purchasing eText Materials from TTC and receive a "credit" to their student accounts for the "full cost" of the class materials. But, a student exercising his/her purported option to "opt-out" of the Inclusive Access Program is locked out of necessary course materials and assignments. This eliminates any actual "option" for students, coercing them to purchase eText Materials from TTC only.

13. In October 2017, TTC and its selected publisher, Pearson, discussed whether students would have an option to opt-out of the program and how the program should be funded. TTC considered whether it should: "[c]harge [students] as a course fee with no choice" "[a]llow student[s] to make [a] choice and charge them for book charges if they don't opt-out" or "[a]llow [students] to purchase on their own via ecommerce link." TTC allegedly chose the second option.

14. During that meeting, TTC emphasized that any TTC faculty using the program "MyLabsPlus" for course assignments will "want all students to have course material and not be able to opt-out." Below is an excerpt from the meeting notes attached hereto as **Exhibit C**.

Other discussion items:
- Our students may likely opt-out if they have a choice. Communication about affordability is critical. Pearson could provide marketing material from other colleges.
- My Labs Plus – faculty would want all students to have course material and not be able to opt-out

15. In accordance with TTC's instruction, Pearson confirmed that any student taking a course that uses "MyLabsPlus" cannot opt-out of the program. There is no option for the student to purchase an access code from another retailer because "any student who opts-out will not have access to Plus." And, as one TTC professor put it bluntly, the result is an "**automatic failure since they cannot do their work**." Copies of the relevant emails are attached hereto as **Exhibit D**.

From: Schmid, Mark
Sent: Thursday, June 14, 2018 1:56 PM
To: Harris, David
Subject: RE: MyLabsPlus Batch Enrollment - Contact Request

David,

So, if a student "opts out" they will still be in the course but have no access to the software (because I will be manually deleting them from their MLP course – i.e. automatic failure since they cannot do their work), according to Devon's previous emails.

Can Bio students opt out of paying the lab fee?

If there really is no option in order to take/complete the course – then just include the fee for access in the tuition and remove the opt out feature. That would be seemless.

See you at 2:30 today.

Mark

16.     As confirmed in an e-mail from TTC's publisher to TTC's David Harris, Assistant Vice President–Instruction, if a student opts-out of the program to purchase his/her textbooks from another textbook retailer, the student "will not [have] access to the custom courses that are being used at Trident," and several TTC courses use books that "are no longer available nationally."  And, to the extent a student *can* opt-out of a course and purchase an access code from another retailer, the student could be deprived of necessary course material for "a few days to a week" while the publisher "manually re-enroll[s]" the student.  A copy of the below email is attached hereto as **Exhibit E**.

**From:** Devon Holder <devon.holder@pearson.com>
**Sent:** Thursday, July 26, 2018 8:27 AM
**To:** Harris,David
**Cc:** Brian Buckley
**Subject:** National ISBNs

Hi David,

Here is a list of the equivalent national title ISBNs that are being used in the pilot program.

It's important to note that if a student purchases one of these national products, it will not give them access to the custom courses that are being used at Trident. There is no location in the custom courses for students to input a non-custom access code purchased outside of the Inclusive Access program. We would have to manually confirm the student's purchase and then manually re-enroll that student into the content they had opted out of. That process could take a few days to a week to complete.

Also, there are 3 titles in use in the custom courses at Trident that are no longer available nationally. I have noted those below in the National Access Card ISBN column.

Please let me know if you have any questions about this or if there is anything else I can help you with. I am planning to be on campus with Meredith on August 1st. I'd like to stop by to review the new D2L demo course and the student-facing documentation if you have some time available that day. Let me know what times would work best for you. Thanks!

17.     During the Fall 2018 semester, several students who opted out of TTC's program so they could purchase textbooks and course-related materials from VPC returned the materials after talking with their professors.  TTC professors falsely told their students that they were required to purchase their course materials from TTC, students are unable to participate using national versions purchased from VPC, professors are unable and/or unwilling to arrange for students to use national versions purchased from VPC, and materials purchased from VPC are

more expensive than TTC's pricing. Other students informed VPC that they attempted to opt-out of the program, but were unable to do so.

18. As a result of TTC's program, VPC has lost hundreds of actual and prospective customers during both the Fall 2018 and Spring 2019 semesters.

19. By letter dated October 29, 2018, VPC informed Defendants of the circumstances described herein, and explained that the circumstances constitute unfair competition in violation of applicable law.

20. TTC, through counsel, responded to VPC's letter by falsely denying any unlawful conduct, claiming it is their "intent that students have the ability to opt out of the program without adverse consequences."

21. TTC's actions described herein above were tortious, malicious and corrupt, in that TTC intended to prejudice and injure VPC.

**FOR A FIRST CAUSE OF ACTION**
(South Carolina Unfair Trade Practices Act)

22. VPC incorporates the previous allegations of the Complaint as if repeated verbatim herein.

23. By the numerous acts recited herein, the Defendants have restrained competition in the marketplace of college textbooks and course-related materials in South Carolina, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of South Carolina's Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. (the "Act").

24. TTC's conduct occurred "in commerce" within the meaning of the Act.

25. TTC's misconduct affects the public interest and is "capable of repetition," within the meaning of the Act and associated case law.

7

26. As a direct and proximate result of TTC's misconduct, VPC has suffered damages in an amount to be determined at trial. Thus, VPC is entitled to its actual damages, trebled, under the Act, together with an award of its reasonable attorneys' fees.

27. In addition, VPC seeks injunctive relief requiring TTC to cease and desist from restraining competition by VPC in the marketplace of college textbooks and course-related materials.

**FOR A SECOND CAUSE OF ACTION**
(Intentional Interference with a Contractual Relationship)

28. VPC incorporates the previous allegations of the Complaint as if repeated verbatim herein.

29. VPC had contractual agreements with many TTC students who purchased Printed Materials and eText Materials for their TTC courses.

30. Defendants knew that VPC had such contracts with these students.

31. Defendants intentionally and without justification procured the breach of these contracts through improper means.

32. As a direct and proximate cause on the intentional acts of Defendants in interfering with VPC's contractual relationships, VPC has suffered substantial damages in an amount to be determined at trial.

33. In addition, because Defendants acted intentionally and with reckless disregard for VPC's rights, VPC are entitled to recover punitive damages.

**FOR A THIRD CAUSE OF ACTION**
(Intentional Interference with Prospective Advantage)

34. VPC incorporates the previous allegations of the Complaint as if repeated verbatim herein.

35. Defendants knew that VPC had agreements with students to provide Printed Materials and eText Materials for TTC courses, and for students to purchase such materials from VPC.

36. Defendants knew that VPC had contacted many TTC students to sell additional Printed Materials and eText Materials.

37. Defendants intentionally interfered with VPC's potential advantage of receiving revenue for selling Printed Materials and eText Materials.

38. Defendants intended to interfere with VPC's prospective advantage by disseminating false information about VPC's pricing and setting up a scam program that intentionally prohibited students from being able to opt-out of TTC's program and purchase textbooks from other retailers.

39. Defendants' purposes and methods of interfering with and/or threatening VPC's prospective business advantage were improper, unlawful, unjustified and subject them to liability.

40. As a direct and proximate cause on the intentional acts of Defendants in interfering with VPC's contractual relationships, VPC has suffered substantial damages in an amount to be determined at trial.

41. In addition, because Defendants acted intentionally and with reckless disregard for VPC's rights, VPC are entitled to recover punitive damages.

**WHEREFORE**, having fully set forth its Complaint against Defendants, VPC prays for the following relief:

(a) Actual damages, trebled, against Defendants, in an amount to be determined by the jury, on VPC's cause of action for violation of the South Carolina Unfair Trade Practices Act;

(b) Actual and punitive damages against Defendants, in an amount to be determined by the jury, on VPC's cause of action for Intentional Interference with a Contractual Relationship;

(c) Actual and punitive damages against Defendants, in an amount to be determined by the jury, on VPC's cause of action for Intentional Interference with Prospective Advantage;

(d) Injunctive relief requiring TTC to cease and desist from restraining competition by VPC in the marketplace of college textbooks and course-related materials;

(e) VPC's reasonable attorneys' fees and the costs and expenses of this action; and

(f) Such other and further relief as this Court deems just and proper.

This the 31st day of January, 2019.

s/ Amanda Pickens Nitto
Amanda Pickens Nitto
Federal I.D. No. 12620
anitto@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
202 East Main Street, Suite 201
Rock Hill, South Carolina  29730
Telephone:     (803) 325-2910
Facsimile:     (803) 325-2929

*Attorney for Plaintiff*